IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>RICHARD GONZALEZ, a/k/a "Richie,"<br><br>                Defendant. | 4:23CR3051<br>4:23CR3052<br><br>PLEA AGREEMENT |

IT IS HEREBY AGREED between the plaintiff, United States of America, through its counsel, Susan T. Lehr, Acting United States Attorney, and Lesley A. Woods, Assistant United States Attorney, and defendant, RICHARD GONZALEZ, a/k/a "Richie," and Steve Lefler, counsel for defendant, as follows:

## I

## THE PLEA

A.    CHARGE(S) & FORFEITURE ALLEGATION(S).

Defendant agrees to plead guilty to Count I of the Indictment in 4:23CR3051. Count I charges a violation of Title 18, United States Code, Section 1349 and 1343, conspiracy to commit wire fraud.

B.    In exchange for the defendant's plea of guilty as indicated above, the United States agrees as follows:

       1.    The United States will move to dismiss Counts II through X at the time of sentencing in 4:23CR3051 and to dismiss Count I in 4:23CR3052, subject to the relevant conduct agreement described in Section V, related to sentencing in this matter.

       2.    The United States agrees that the defendant will not be federally prosecuted in the District of Nebraska for obstruction of justice, fraud, conspiracy, and aiding and abetting those offenses, other than as set forth in paragraph A, above. This agreement not to prosecute the defendant for specific crimes does not prevent any prosecuting authority from prosecuting the defendant for any other crime, or for any crime involving physical injury or death.

1

# II
## NATURE OF THE OFFENSE

A. ELEMENTS EXPLAINED.

Defendant understands that the offense to which defendant is pleading guilty has the following elements:

1. Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in Count I; and
2. The defendant knew the unlawful purpose of the plan and willfully joined in it.

B. ELEMENTS UNDERSTOOD AND ADMITTED - FACTUAL BASIS.

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crime and admits that there is a factual basis for this guilty plea. The following facts are true and undisputed.

1. At times material to Count I, defendant RICHARD GONZALEZ, a/k/a "Richie" was a member of the Latino Peace Officers Association ("LPOA") but was not a board member of LPOA. The defendant was also the Executive Director for the PACE charity at times relevant to Count I in 4:23CR3051. The defendant is a retired Captain with the Omaha Police Department ("OPD").

2. At times material to Count I, defendant JOHNNY PALERMO was a police OPD and president of LPOA. JACK OLSON, at times material to Count I of 4:23CR3051 was the fundraiser for LPOA.

3. At times material to Count I, defendant RICHARD GONZALEZ, a/k/a "Richie", a retired OPD police captain and the Executive Director of Police Athletics for Community Engagement ("PACE"), without having full board authorized authority to do so, conducted financial transactions for the charity and caused payments to himself, JOHNNY PALERMO, and JACK OLSON, a/k/a "Cody Jones", along with others, without disclosing material payments to donors or the LPOA board.

4. At times material to Count I, defendant JACK OLSON used the false identity of "Cody Jones," and with the knowledge and assistance of JOHNNY PALERMO and RICHARD GONZALEZ would solicit funds from individuals and entities in the District of Nebraska on behalf of LPOA using that identity. Donors were unaware that Cody Jones is in fact JACK OLSON, and that JACK OLSON was

2

keeping approximately 65% to 80% or more of donations made to LPOA for himself. The donor letters that JOHNNY PALERMO signed and authorized for LPOA falsely represented that "every penny" of the donations went to athletic programs to keep target youths out of gangs and to other LPOA causes. The LPOA website similarly represented that 100% of donations went to athletic programs for children when in fact LPOA was not organizing and administering any athletic programs for children in Omaha at times material to Count I. JACK OLSON did not file income tax returns based on this income and did not pay income tax. RICHARD GONZALEZ brought JACK OLSON to LPOA after JACK OLSON was terminated for cause from his previous employment as a solicitor or fundraiser.

5. At times material to COUNT I, there were LPOA board members who were not even aware that JACK OLSON had a contract to raise funds for LPOA. The contract was signed by JOHNNY PALERMO and facilitated by RICHARD GONZALEZ without these board members seeing or voting on the contracts.

6. At times material to COUNT I, JOHNNY PALERMO increased the percentage of donations that JACK OLSON kept for himself from 65% of gross donations to 80% of gross donations without presenting the increase to the LPOA board for its consideration and approval.

7. Between on or about January 1, 2016, and April 5, 2023, in the District of Nebraska and elsewhere, JOHNNY PALERMO, RICHARD GONZALEZ, and JACK OLSON, defendants herein, and others known and unknown to the grand jury, did knowingly combine, conspire, confederate, and agree with each other to commit wire fraud, to wit, they agreed to knowingly devise a scheme and artifice to defraud LPOA and its donors, as to material matters and to obtain money and property from LPOA and its donors, by means of false and fraudulent pretenses, representations, promises, and omissions of material facts in violation of 18 U.S.C. § 1343.

8. It was part of the conspiracy and scheme to defraud that JACK OLSON claimed he employed multiple individuals, such as drivers, and had significant overhead costs and

operated a "call center," when, in fact, JACK OLSON primarily worked alone out of a residence in Council Bluffs, Iowa until it burned down.

9. It was part of the conspiracy and scheme to defraud that JACK OLSON sent e-mails in the name of "Cody Jones," to donors with statements such as the following, "(Victim MK), Please remember that this is not just a big cop party, we do this to raise funds so that volunteer Omaha police officers can help at risk and disadvantaged local youth! any amount will be appreciated. Cody," when in fact, it was part of the conspiracy for JACK OLSON to spend more than $46,000 dollars of money donated to LPOA at the Lemon Drop bar for the benefit of himself, his co-defendants, and others known to the grand jury on alcohol and so that he and RICHARD GONZALEZ could gamble on Keno at the Lemon Drop bar.

10. It was part of the conspiracy and scheme to defraud that defendants and their co-conspirators did not disclose to the entire LPOA board that JOHNNY PALERMO and RICHARD GONZALEZ were spending LPOA money on a trip for themselves and friends and city councilman VINCENT J. PALERMO to Las Vegas, Nevada, and other destinations, and were spending LPOA money at restaurants and bars for their own personal benefit. They further failed to disclose to the entire LPOA board and to LPOA donors that their friends, family members, and associates' travel was paid for by LPOA, using money that was fraudulently raised by JACK OLSON.

11. It was part of the conspiracy and scheme to defraud that defendants and their co-conspirators did not disclose to the LPOA board that JOHNNY PALERMO and increased JACK OLSON's percentage cut of the donations received to LPOA from 65% to 80%. Overall, JACK OLSON removed more than a half million dollars from contributions given to LPOA between on or about January 1, 2018, and December 31, 2022.

12. It was part of the conspiracy and scheme to defraud that defendants and their co-conspirators did not disclose to the entire LPOA board that JOHNNY PALERMO authorized personal loans to JACK OLSON out of the charity funds. This was done in addition to the 65 to 80% cut that JOHNNY PALERMO authorized for JACK OLSON in a contract that JOHNNY PALERMO signed for LPOA but did not disclose to the LPOA board.

13. It was part of the conspiracy and scheme to defraud that RICHARD GONZALEZ would loan JACK OLSON thousands of dollars on an approximately annual basis, with knowledge that the only money JACK OLSON earned was the money from the scheme to defraud LPOA and its donors and that the money from the scheme would be used to reimburse RICHARD GONZALEZ for the loans.

14. It was part of the conspiracy that RICHARD GONZALEZ falsely represented on LPOA tax returns that JACK OLSON did not have custody of the LPOA donations as the solicitor for LPOA, however RICHARD GONZALEZ would personally contact the Omaha Police Credit Union and authorize JACK OLSON to cash checks made out to LPOA and leave with LPOA funds without requiring JACK OLSON to first go through the LPOA bookkeeper and without disclosing this practice to the LPOA board, LPOA donors, or the federal government. RICHARD GONZALEZ knew that JACK OLSON had custody of donations at the time that RICHARD GONZALEZ caused the false statement in the charity tax return.

15. It was part of the conspiracy that JACK OLSON would receive restaurant gift cards, such as Texas de Brazil gift cards, and other items of value from donors that JACK OLSON would offer to RICHARD GONZALEZ and JOHNNY PALERMO without reporting those donations to the LPOA bookkeeper.

16. It was part of the conspiracy and scheme to defraud that defendants and their co-conspirators, on or about the dates set forth below, did, through false representations and material omissions cause and solicit the following non-exhaustive list of victim donors to donate to LPOA through this scheme:

| Victim (location) | Donation Amount Totals and Date Ranges |
|---|---|
| Wal-Mart (Arkansas) | Approximate total of donations from March, 2019, to June, 2022: $67,000. |
| S&C Wholesale (Englewood Colorado) a/k/a "JBS" | Approximate total of donations from April, 2019, to August, 2022: $50,000. |
| Scheels (North Dakota) | Approximate total of donations from July, 2019, to February, 2022: $1,000. |

| | |
|---|---|
| Cargill Beef (Schulyer, NE) | Approximate total of donations from August, 2019, to April, 2022: $6,500 |
| Catholic Archbishop of Omaha | Approximate total of donations from July, 2019, to January, 2022: $11,500 |
| Ameriprise Financial Services, Inc. (Minneapolis, MN) | Approximate total of donations from March, 2019, to June, 2020: $5,500. |
| Midnite Dreams (Waverly, NE) | May 16, 2019: $750 |

17. As part of the conspiracy and scheme to defraud described above, caused to be transmitted by means of wire communications, in interstate commerce and utilizing facilities of interstate commerce, the signals and sounds described below:

| Wire | Date | Wire Communication |
|---|---|---|
| Text Message from JACK OLSON to RICHARD GONZALEZ | 12/8/2021 | "Rich, Please get me the account and routing number info from bank." |
| Phone call intercepted between a witness (W1) known to the grand jury and JOHNNY PALERMO ("JP") | 9/9/22 | W1: Richie's so fucking dirty at times man… <br> JP: check this out though, so you didn't know but, motherfucker been getting money off my name <br> W1: Oh yeah <br> JP: with Jack, and they use that all the time…I told Jack, quit calling my people man, every time you need some money… <br> W1: Is Jack the dude that's always with [witness known to the grand jury] <br> JP: huh, yeah <br> JP: Bro let me tell you, between me and you, you can't tell nobody so don't even tell [witness known to the grand jury] he (Jack) raised in 6 months, he raised $125,000, right? <br> W1: uh huh <br> JP: But he keeps 80% of it <br> W1: What now?.... |

6

| | | |
|---|---|---|
| | | JP: And he (Jack) broke, he hangs with Rich and all they do is spend money between you and me, at the bar on Keno, you know what I mean<br>W1: Yeah Rich, Rich getting all this money dog. You know what I'm saying.<br>JP: Yep |
| Phone call intercepted between JOHNNY PALERMO ("JP") and RICHARD GONZALEZ ("RG") | 9/11/22 | RG – hey…your…. new nick name…it ain't going to be JP, it's going to be reverend J,… cuz he gets paid to be at church every Sunday…<br>RG - what time you done, you and ah looks, like me you and [a witness known to the grand jury] and Jack<br>JP - let's go…I'm putting a text out a couple people - I know some freaks- just to show up, you know what I'm saying, we'll get their drinks cuz LPOA is paying for it you know what I'm saying so...<br>RG - yeah that's what I was going to say if you got the cards<br>JP - naw but I got my card and I'll get a receipt later you know what I'm saying<br>RG - oh yeah get reimbursed, I don't know why he put it under PACE but that's fine |
| Text Message sent from JACK OLSON ("JO") to a potential LPOA donor | 10/11/2022 | "This Is Cody with Omaha Latino Peace Officers Association. Thank you for your support with everything LPOA does for at-risk and disadvantaged youth from here in the inner city…can we count on your support again for our Christmas Party for kids and our food basket giveaway? We call it Presents from the Police. You have helped us with it the past few years, can we count on you for $500 again? Please let me know, Cody." |
| Phone call intercepted with RICHARD GONZALEZ ("RG"), JOHNNY PALERMO ("JP") and a witness known to the | 10/17/22 | RG: Are we on speaker?<br>W2: Yeah, what's up?<br>RG: Tell Johnny he's got to start fucking vetting these people that we hang out with…<br>RG: Well…Jack never sold you out on being there…<br>JP: Rich, we gotta suspect that everyone is a fucking snitch… the only people we gotta protect is us now<br>RG: Hey, hey, I trust you and [witness known to the grand jury]. I trust nobody fucking else bro….But you're right Johnny, you got to treat it like |

7

| | | |
|---|---|---|
| grand jury (W2) | | everybody's a snitch…we gotta protect each other…we on an island…<br>JP: We are on an island by ourselves, everybody else lying, they jealous of us<br>RG: I've been through this with the FBI, with you, you know that. I mean fuck, your last investigation, we knew what was up, these motherfuckers trying to get us, we didn't do nothing. Didn't do nothing this time either.<br>JP: Man, only thing they get us, if they ever get us, is fucking bitches and drinking and getting money, that's it.<br>RG: Yep, that's it bro…<br>W2: No hey, we just gotta see what Jack says you know, hey Rich, and one more thing, text "Cody Jones," on his work number and say call me on this phone, you know.<br>RG: Yeah, yeah.<br>W2: And put your other phone in the fucking washer or microwave<br>RG: No, yeah, fuck |
| Phone call intercepted between JOHNNY PALERMO ("JP") and Victim of the Scheme ("V") | 12/14/22 | JP - Hello?<br>V - Hi, is this Johnny Palermo?<br>JP - Yes<br>V - Hi this is [a victim known to the grand jury].... I'm the donation manager<br>JP - Yeah, how you doin?<br>V - Yeah, I'm good. Well… for the last four years at least we've donated to the Latino Police Association…<br>JP - Right<br>V - And um recently I was contacted by the FBI … so … I need to get some answers…<br>JP - Okay<br>V - So one is Cody Jack. Um, I've been told I-that may not even be this man's name. He's the one that always contacts me<br>JP - Is it-is it Cody Jones?<br>V - Umm, could be Cody Jones<br>JP - So he-he-he's the one that you know came to us and said that he would solicit funds. …his name is Jack Olson. And he hasn't paid his taxes in I dunno in like in five years… |

|  |  | V - Yeah, well that's what I heard…one of the things we really look at in organizations is, number one, our money goes to what we put it to…and I've been told that he's takin more than half of it as a cut and you-and the only a very small portion goes … to your guys' organization<br>JP - Right. And you know w-w-w-w-<br>V - Is that-is that true?<br>JP - Well, yeah, that's what they told me<br>JP - Yeah, well yeah. That-he takes a large cut of it and um (V - Mhm) …but the money goes to good causes that stuff that we do in the community but his overhead is his overhead, you know? And I don't-you know-I think he has pai-paid drivers...<br>V - Well … I've been doin this for 13 years…(JP - Right) I-I-I guess I-I don't understand how y-how whoever-whoever hired him (JP - Mhm) didn't understand like how much of a cut he was taking…<br>JP – Right |

### III

### **PENALTIES**

A.  COUNT I. Defendant understands that the crime to which defendant is pleading guilty carries the following penalties:

1. A maximum twenty (20) years in prison;
2. A maximum 250,000 fine;
3. A mandatory special assessment of $100 per count; and
4. A term of supervised release of not more than three (3) years. Defendant understands that failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring defendant to serve in prison all or part of the term of supervised release.
5. Possible ineligibility for certain Federal benefits.

9

# IV
# AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
## DISTRICT OF NEBRASKA

This plea agreement is limited to the United States Attorney's Office for the District of Nebraska, and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

# V
## SENTENCING ISSUES

A. SENTENCING AGREEMENTS

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree the defendant shall receive a sentence not to exceed twenty-ones months and that the conduct in Count I of 4:23CR3052 may be considered as relevant conduct for the purposes of sentencing on Count I of 4:23CR3051. The parties disagree as to the loss amount, specific offense characteristics, and any adjustment in this case, and each party reserves the right to put forward evidence and to make arguments at time of sentencing. The parties do agree that there was a loss amount in connection with PACE and that it should be considered for a payment plan and restitution, and the parties also agree that the defendant had some role in a portion of the proceeds that Johnny Palermo got from LPOA and PACE but reserve the right to dispute those amounts and to present evidence concerning those matters at time of sentencing.

The Court shall determine the appropriate restitution in this mater, and the amount of restitution ordered by the Court shall include all relevant conduct, including, but not limited to, all charged and uncharged criminal conduct alleged in the Indictment, and not limited to the count(s) of conviction. The parties specifically making the following restitution agreements:

Defendant further agrees to the following regarding Restitution:

a. The amount of restitution ordered by the Court shall include all relevant conduct, including, but not limited to, all charged and uncharged criminal conduct alleged in the Indictment, and not limited to the count(s) of conviction.

b. Defendant also shall pay the Special Assessment of $100 per count of conviction by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case.

c. Restitution and Assessment payments shall be made payable to the "U.S. District Court Clerk."

d. The parties agree that restitution amounts and amounts disbursed to any victims will be determined at sentencing by the District Court and that the defendant will abide by the District Court's order.

e. Court imposed monetary penalties are due immediately and subject to immediate enforcement by the United States. 18 U.S.C. § 3613.

f. Any Court ordered schedule for restitution payments is merely a minimum payment obligation, and does not limit the methods by which the United States may immediately enforce the judgment in full, including but not limited to enrollment in the Treasury Offset Program (TOP) (see 26 U.S.C. § 6402(d); 31 U.S.C. §3720A; 31 U.S.C. § 3716) and garnishment of available funds, wages, or assets (see 18 U.S.C. §§3613, 3664(m)).

g. If incarcerated, Defendant will participate in the Bureau of Prisons Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a payment schedule.

h. Defendant will provide all of defendant's financial information to the United States and the Probation Officer, and agrees, if requested, to participate in a pre-sentencing debtor exam. Defendant will fully and truthfully disclose all assets and property in which Defendant has any interest, or over which Defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party.

i. At the request of the U.S. Attorney's Office (USAO), Financial Litigation Program (FLP), Defendant will promptly execute and return a fully completed and executed Financial Disclosure statement under oath, a Tax Information Authorization Form 8821, and a Request for Transcript of Tax Return Form 4506-T. Defendant also agrees to provide the USAO FLP copies of financial information that Defendant submitted to the U.S. Probation Office.

j. Defendant authorizes the USAO FLP to obtain Credit Reports concerning Defendant to enable the USAO to evaluate Defendant's ability to satisfy any financial obligations and monetary penalties imposed as part of the sentence and will execute any Release for such information upon request.

k. Defendant understands that compliance with USAO requests for financial information will be taken into account when the United States makes a recommendation to the Court regarding Defendant's acceptance of responsibility at sentencing. Defendant's failure to timely and accurately complete and sign the financial statement and any update thereto, may, in addition to any other penalty or remedy, indicate a failure to accept responsibility.

l. Defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until Defendant has satisfied restitution in full.

m. Defendant certifies that Defendant has not transferred assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Defendant promises that Defendant will make no such transfers in the future.

n. If the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which Defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of Defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, enforce the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, including enforcement of 100 percent of the value of any previously undisclosed asset. Defendant agrees not to contest enforcement against of such asset or property. If the United States opts to be relieved of its obligations under this plea agreement, Defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

This negotiated agreement resolves all issues related to the case and is the appropriate disposition.

B. <u>ADJUSTMENTS, DEPARTURES & REDUCTIONS UNDER 18 U.S.C. § 3553</u>.

The parties agree that defendant may request or recommend additional downward adjustments, departures, including criminal history departures under U.S.S.G. § 4A1.3, and sentence reductions under 18 U.S.C. § 3553(a), and that the United States will oppose any such downward adjustments, departures, and sentence reductions not set forth in Section V, paragraph A above.

C.      "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION.

The parties agree that the facts in the "factual basis" paragraph of this agreement, if any, are true, and may be considered as "relevant conduct" under U.S.S.G. § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

The parties agree that all information known by the office of United States Pretrial Service may be used by the Probation Office in submitting its presentence report and may be disclosed to the court for purposes of sentencing.

## VI

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

The defendant hereby knowingly and expressly waives any and all rights to appeal the defendant's conviction and sentence, including any restitution order in this case, and including a waiver of all motions, defenses, and objections which the defendant could assert to the charges or to the Court's entry of Judgment against the defendant, and including review pursuant to 18 U.S.C. § 3742 of any sentence imposed, except:

>    (a) As provided in Section I above, (if this is a conditional guilty plea); and
>    (b) A claim of ineffective assistance of counsel.
>    (c) A right to file a motion under Section 3582(c)(1)(A);
>    > 1. the general right to file a compassionate release motion;
>    > 2. the right to file a second or successive such motion; or
>    > 3. the right to appeal the denial of a compassionate release.

The defendant further knowingly and expressly waives any and all rights to contest the defendant's conviction and sentence in any post-conviction proceedings, including any proceedings under 28 U.S.C. § 2255, except:

13

(a) The right to timely challenge the defendant's conviction and the sentence of the Court should the Eighth Circuit Court of Appeals or the United States Supreme Court later find that the charge to which the defendant is agreeing to plead guilty fails to state a crime.

(b) The right to seek post-conviction relief based on ineffective assistance of counsel.

If defendant breaches this plea agreement, at any time, in any way, including, but not limited to, appealing or collaterally attacking the conviction or sentence, the United States may prosecute defendant for any counts, including those with mandatory minimum sentences, dismissed or not charged pursuant to this plea agreement. Additionally, the United States may use any factual admissions made by defendant pursuant to this plea agreement in any such prosecution.

## VII
## BREACH OF AGREEMENT

Should it be concluded by the United States that the defendant has committed a crime subsequent to signing the plea agreement, or otherwise violated this plea agreement, the defendant shall then be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted. Any such prosecution(s) may be premised upon any information, statement, or testimony provided by the defendant.

In the event the defendant commits a crime or otherwise violates any term or condition of this plea agreement, the defendant shall not, because of such violation of this agreement, be allowed to withdraw the defendant's plea of guilty, and the United States will be relieved of any obligation it otherwise has under this agreement and may withdraw any motions for dismissal of charges or for sentence relief it had already filed.

## VIII
## SCOPE OF AGREEMENT

A. This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral.

B. By signing this agreement, the defendant agrees that the time between the date the defendant signs the agreement and the date of the guilty plea will be excluded under the Speedy Trial Act. The defendant stipulates that such period of delay is necessary in order for the defendant to have opportunity to enter the anticipated plea of guilty, and that the ends of justice served by such period of delay outweigh the best interest of the defendant and the public in a speedy trial.

C. The United States may use against the defendant any disclosure(s) the defendant has made pursuant to this agreement in any civil proceeding. Nothing contained in this agreement shall in any manner limit the defendant's civil liability which may otherwise be found to exist, or in any manner limit or prevent the United States from pursuing any applicable civil remedy, including but not limited to remedies regarding asset forfeiture and/or taxation.

D. Pursuant to 18 U.S.C. § 3013, the defendant will pay to the Clerk of the District Court the mandatory special assessment of $100 for each felony count to which the defendant pleads guilty. The defendant will make this payment at or before the time of sentencing.

E. By signing this agreement, the defendant waives the right to withdraw the defendant's plea of guilty pursuant to Federal Rule of Criminal Procedure 11(d). The defendant may only withdraw the guilty plea in the event the court rejects the plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(5). Furthermore, defendant understands that if the court rejects the plea agreement, whether or not defendant withdraws the guilty plea, the United States is relieved of any obligation it had under the agreement and defendant shall be subject to prosecution for any federal, state, or local crime(s) which this agreement otherwise anticipated would be dismissed or not prosecuted.

## IX
## **MODIFICATION OF AGREEMENT MUST BE IN WRITING**

No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties.

## X
## DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT

By signing this agreement, defendant certifies that defendant read it (or that it has been read to defendant in defendant's native language). Defendant has discussed the terms of this agreement with defense counsel and fully understands its meaning and effect.

UNITED STATES OF AMERICA
SUSAN T. LEHR
Acting United States Attorney

8/29/23
Date

LESLEY A. WOODS
ASSISTANT U.S. ATTORNEY

8·27·23
Date

RICHARD GONZALEZ, a/k/a "Richie"
DEFENDANT

8-27-23
Date

STEVE LEFLER
COUNSEL FOR DEFENDANT

16